## CAPPS *v.* STATE.

(Division B.  June 10, 1940.)

[196 So. 639.  No. 33944.]

**I. L. Sheffield**, of Fulton, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

Olen Capps was indicted and tried for the murder of one Cleo Gordon in the Circuit Court of Itawamba County, and was given a life sentence, from which he appeals.

The principal ground of error relied upon is that the evidence is insufficient to show that the appellant is guilty of the killing; and, that the evidence is insufficient to show that it occurred in Itawamba County. It is argued also that the evidence is insufficient to sustain the charge of murder, that is, that the appellant committed the crime or participated therein.

The evidence shows that the appellant, Olen Capps, Cleo Gordon and other parties went to a camp located on the Tombigbee River near the line between Itawamba and Monroe Counties, this camp having been operated by Swep Schumpert. From the evidence, all of the parties appeared to have been drinking on arrival at the camp, and as more liquor was desired, a discussion arose as to payment for liquor to be purchased; Cleo Gordon stated that he would pay his part, to which appellant replied "pay your part, hell, you are going to pay all of it;" which brought on a heated (cursing) discussion, during which Capps knocked Gordon down and as Gordon attempted to arise, Capps struck him again under the jaw, knocking him unconscious; and, after an unsuccessful effort to revive him, he was carried into a room at the camp and placed upon a bench made of a 2 x 12 pine plank. Two state witnesses testified to this occurrence. Joe Adams testified that he left immediately, before Gordon recovered or regained consciousness, if he ever did. Sometime during the day, certain parties at the camp went from what is known as the "bunk house" to the river, a short distance away, and they found Gordon's clothing. The ground was hard where the clothing was found and no tracks were seen. These parties returned to the bunk house, after calling Gordon and receiving no response, and reported the finding of the clothes

and the fact that he did not respond when called. Thereupon a number of people went to the place where the clothing was, and they saw barefoot tracks in the sand between the clothing and the river. The clothing did not have any blood upon it.

It appears from the record that on the day of the disappearance of Gordon, there was considerable drinking in the fishing camp, and that Schumpert, who operated the camp, was very drunk during part of the day; and the conduct of the parties present disreputable. Schumpert testified that, on the Sunday of Gordon's disappearance, he came through his room and stated that he was "of a good mind to end it all," and that he went out of the room and disappeared in a thicket in the direction of the river, and that he did not see him again.

A justice of the peace and constable were sent for. As some of the witnesses expressed it, they sent for the "law." A search was instituted for the body, but it was not found until Wednesday (Gordon having disappeared on Sunday). The body was found about a mile and a half down the river lodged against a tree top, with one hand and a portion of the legs visible. An examination disclosed that the body was considerably decomposed, one ear and part of the face having been eaten away; also that it had been stabbed twice; the throat cut to the bone from side to side, every vein and artery being severed; the neck broken; and the lungs filled with air. Between the time the clothing was discovered and the finding of the body, Capps and a number of others were arrested and placed in jail; but it seems that they were carried along in the search and were questioned from time to time with reference to the matter. When the officers arrived at the place where the clothing was found, they questioned one Schumpert, and he stated that he thought Capps killed Gordon. Whereupon, Capps, in effect, stated that it "looked like he (Schumpert) was trying to lay the whole blame on him, and he had a good mind to unravel the whole thing that night." This was testified to by the deputy sheriff of Itawamba County.

It was also in evidence that while Capps was in jail, during the time of the search for the body of Gordon and before it was found, that the county attorney was sent for by Capps and Thornley (one of the arrested parties) and he went to the jail to see them, accompanied by another person, and upon inquiring why they had sent for him, Capps said they wanted to talk to him about dynamiting the river, that they understood that it was to be done that afternoon in an effort to locate the body. The county prosecuting attorney's testimony concerning this is, as follows:

"Q. When you got over to the jail, who was the first person to talk, you or Olan Capps? A. I asked both of them 'What do you all want with me?'

"Q. Was that all you said? A. Yes.

"Q. What did Olan Capps say in reply? A. He said he understood they were fixing to dynamite the river and asked me if I thought it was fair to them and I asked him why and he remarked if we found Gordon's neck broken they would charge them with it and I made the remark 'If you all broke his neck and threw him in the river you all are responsible, and if we break his neck dynamiting, we will be responsible.'"

Other witnesses testified that Capps said if dynamite were thrown in the river and it exploded near the body, it would break the body up, the bones, possibly the neck; and if the body were found with the neck broken, they would be suspicioned or held responsible for it.

The deceased could not have inflicted the described injuries upon himself. Had he drowned, his lungs would have been filled with water, whereas, the testimony shows that his lungs were filled with air; consequently, the only reasonable deduction is that the man was dead and his body cast into the river near the camp by the murderer or murderers to dispose of it, and that it floated down the river until it decomposed to the extent that it came to the surface. We think that the facts are sufficient to show that the murder was committed in Itawamba County,

although it is argued that the venue has not been proved and that it is uncertain that the death occurred in Itawamba County. We also think that the evidence is sufficient to show that the crime was murder. There is no proof that the person was dead when he was stabbed, his throat cut and neck broken. If it had been shown that Gordon died from the blows struck by Capps with his fist when he was rendered unconscious, it might have been manslaughter, but if Gordon died from the blow, would there have been a reason to mutilate the body. Whereas, if he had regained consciousness, there might have been a motive for killing him. The evidence shows that some of the parties at the camp went across the river to get liquor but Gordon did not go with them. Someone on that trip said that he would stay around and report what he saw to the law. In other words, apprehension on the part of the parties, who brought Gordon to the scene, that he might report what he saw at the camp to officers of the law might have been a motive. No doubt the drunken condition of the various parties had much to do with bringing about the death and mutilation of Gordon.

A physician performed a partial post mortem examination. Dr. Tubbs, the physician who examined the body, testified that he could have made a much better examination if he had had proper facilities, or equipment with which to do it. Dr. Tubbs also testified that there was air in the lungs, and that, in his opinion, the man did not drown but that the body had been placed in the river, and that either of the stabs, the broken neck or the throat cut could have produced death; and, of course, he could not say from which he died. He said that the severing of the arteries and veins of the throat would have almost completely drained the blood from the body.

The testimony is quite voluminous, and much of it showed the disrepute of the people and the place where the tragedy occurred. It is not definitely shown how Gordon met his death, by whom or when; but we think that it has

been sufficiently shown that the death was caused by human agency and that Capps was identified therewith.

Capps denied definitely that he struck Gordon. He was asked in examination if he did not think he broke his neck when he struck him and "knocked him out," and he denied that he had struck him at all. He admitted that they went to the place together and that Gordon disappeared, but stated that he did not know where he went. It was in evidence that Capps was barefooted when they went to the river, that he had been around the camp all day, and was when the clothing was found. Capps said that he was barefooted only while at the house, as his shoes were new and hurt his feet, but that when he went to the river he had his shoes on. It is quite evident, we think, that the victim's clothing was removed, and his body mutilated by being stabbed, neck broken and throat cut. It is not unlikely that this was done at the camp. The state witnesses testified that when they saw Gordon last, he was on the bench in an unconscious condition. Part of the bench was produced during the trial, which had blood stains on it. However, witnesses for the defense undertook to account for the blood stains by stating that a hog had been butchered thereon.

There was some effort to build a theory that Gordon came to his death because of the jealousy of two men about Gordon's relations with one of the women who went to the camp with them, but there is no tangible or dependable evidence to sustain this theory. There is no evidence pertaining to any relationship existing between Gordon and the woman referred to as "Dago," but it does indicate that she is a woman of ill repute.

We think the evidence clear and convincing beyond reasonable doubt that Capps was a participant in the murder of Gordon. We have examined the instructions, and all of the contentions in the brief of appellant, and find no reversible error. Therefore the judgment is affirmed.

Affirmed.